**AMERICAN EXPRESS COMPANY**

v.

**UNITED STATES.**

C.D. 4266; Protest 68/59881–54944–67 against the decision of the regional commissioner of customs at the port of New York.

United States Customs Court,
Third Division.
Sept. 13, 1971.

Edward Garfield, Howard M. Landa, Jay L. Samoff and Dolph R. Chianchiano, Greenbaum, Wolff & Ernst, New York City (Edward Garfield, New York City, of counsel), and Barnes, Richardson & Colburn, E. Thomas Honey, New York City, for plaintiff.

L. Patrick Gray, III, Asst. Atty. Gen. (Andrew P. Vance, Glenn E. Harris and Frederick L. Ikenson, New York City, trial attorneys), for defendant.

Before RICHARDSON and LANDIS, Judges.

RICHARDSON, Judge:

The merchandise of this protest consists of steel angles and gusset plates exported from Italy, entered at the port of New York, and classified in liquidation under items 609.84 and 657.20, respectively, of the Tariff Schedules of the United States. This merchandise, constituting component parts of electrical transmission towers, was assessed with a countervailing duty at the rate of 13.67 lire per kilogram in addition to regular duties pursuant to 19 U.S.C.A. section 1303 (section 303, Tariff Act of 1930). The protest is directed only against the assessment of countervailing duties, claiming such assessment to be illegal and null and void for some eight reasons set forth therein as follows:

(1) No bounty or grant was paid or bestowed by the Republic of Italy directly or indirectly upon the manufacture, or production or exportation of the said imported merchandise;

(2) The refund by the Republic of Italy, pursuant to Italian Law No. 639, of the Italian internal taxes, duties and charges which are the subject of Treasury Decision No. 67–102 does not constitute a bounty or grant within the meaning of Section 303 of the Tariff Act of 1930 and the amendments thereto (19 U.S.C. § 1303), and said Treasury Decision is outside the authority of the Secretary of the Treasury;

(3) The question of whether the refund of said Italian internal taxes is a bounty, grant or subsidy and of whether countervailing duty can be imposed is governed by Article VI(4) of the General Agreement on Tariffs and Trade which is not, and was not intended by the United States to be, inconsistent with Section 303 of the Tariff Act of 1930 as amended, and Treasury Decision No. 67–102 contravenes said Article VI(4);

(4) Prior to the issuance of Treasury Decision No. 67–102, the Secretary of the Treasury had knowledge that countries other than Italy make refunds of internal taxes, duties and charges of like character on like products and on other products exported to the United States but he failed to order the imposition of countervailing duty against importations of such products to the United States, thereby discriminating against Italy and failing to accord most-favored nation treatment in contravention of Article I(1) of the General Agreement on Tariffs and Trade and Article XIV(1) of the Treaty of Friendship, Commerce and Navigation btween [sic] the United States and Italy, and also thereby depriving importers of said merchandise from Italy of due process of law and the equal protection of the laws in violation of the Fifth and Fourteenth Amend-

ments to the Constitution of the United States;

(5) There has been a uniform and consistent administrative practice and interpretation of. Section 303 of the Tariff Act of 1930 as amended, and its predecessors, to the effect that refunds of internal taxes by an exporting country do not constitute bounties or grants subject to countervailing duty, which administrative practice and interpretation was approved and adopted by Congress prior to the issuance of Treasury Decision No. 67–102;

(6) To the extent that Treasury Decision No. 67–102 is based on a supposed delegation of power to the Secretary of [sic] Treasury to differentiate the particular Italian internal taxes covered by Treasury Decision No. 67–102, from other types of internal taxes, such delegation of Congressional authority would contravene the Constitution of the United States as there are no standards contained in Section 303 of the Tariff Act of 1930 as amended governing the action of the Secretary of the Treasury;

(7) More than one-half of the Italian internal taxes totalling 13.67 lire per kilogram which are refunded on exports to the United States by the Italian Government under Italian Law No. 639, directly relate to the production, manufacture and distribution of the merchandise which is the subject of these entries and the Secretary of the Treasury was without authority to declare such tax refunds to be bounties, grants or subsidies even if it be assumed arguendo that refunds of taxes that are not directly related to the production, manufacture and distribution of the product do constitute bounties, grants or subsidies; and

(8) The Secretary of the Treasury failed to comply with the requirements of the Administrative Procedure Act (5 U.S.C. § 1001 et seq.) and deprived the importer of due process of law in contravention of the Fifth Amendment to the Constitution of the United States.

The assessment of countervailing duties in this case results from an investigation conducted by the Secretary of the Treasury in 1967, culminating in the promulgation of a determination and an order on April 17, 1967, reported in T.D. 67–102 which reads:

Information was received in proper form pursuant to the provisions of section 16.24(b) of the Customs Regulations (19 CFR 16.24(b)) alleging that certain rebates or refunds granted by the Government of Italy on the exportation from Italy of galvanized fabricated structural steel units for the erection of electrical transmission towers constitute the payment or bestowal of a bounty or grant, directly or indirectly, within the meaning of section 303 of the Tariff Act of 1930 (19 U. S.C. 1303), upon the manufacture, production, or exportation of the units to which the refunds apply.

An investigation was conducted pursuant to section 16.24(d) of the Customs Regulations (19 CFR 16.24(d)).

After consideration of all information received, the Bureau is satisfied that exports of such steel units for electrical transmission towers from Italy receive bounties or grants within the meaning of section 303.

Accordingly, notice is hereby given that galvanized fabricated structural steel units for the erection of electrical transmission towers imported directly or indirectly from Italy (except any such importations which are free of duty under the Tariff Act of 1930, as amended), if entered for consumption or withdrawn from warehouse for consumption after the expiration of 30 days after publication of this notice in the Customs Bulletin, will be subject to the payment of countervailing duties equal to the net amount of any bounty or grant determined or estimated to have been paid or bestowed.

In accordance with section 303, the net amount of such bounty or grant under the information presently available has been ascertained and determined, or estimated, and such net

amount is hereby declared to be 13.67 lire per kilo of the product. Effective on the 31st day after the date of publication of this notice in the Customs Bulletin, and until further notice, upon the entry for consumption or withdrawal from warehouse for consumption of such dutiable galvanized fabricated structural steel units for the erection of electrical transmission towers imported directly or indirectly from Italy, which benefit from such bounties or grants there shall be collected, in addition to any other duties estimated or determined to be due, countervailing duties in the amount ascertained in accordance with the above declaration.

The table in section 16.24(f) of the Customs Regulations (19 CFR 16.24 (f)) is amended by inserting after the last entry for Ireland the word "Italy" in the column headed "Country," the words "Galvanized fabricated structural steel units for the erection of electrical transmission towers" in the column headed "Commodity," the number of this Treasury decision in the column headed "Treasury Decision," and the words "Bounties declared— Rate" in the column headed "Action."

And the provisions of section 1303 [section 303] to which reference is made in T.D. 67–102 read as follows:

Whenever any country, dependency, colony, province, or other political subdivision of government, person, partnership, association, cartel, or corporation shall pay or bestow, directly or indirectly, any bounty or grant upon the manufacture or production or export of any article or merchandise manufactured or produced in such country, dependency, colony, province, or other political subdivision of government, and such article or merchandise is dutiable under the provisions of this chapter, then upon the importation of

any such article or merchandise into the United States, whether the same shall be imported directly from the country of production or otherwise, and whether such article or merchandise is imported in the same condition as when exported from the country of production or has been changed in condition by remanufacture or otherwise, there shall be levied and paid, in all such cases, in addition to the duties otherwise imposed by this chapter, an additional duty equal to the net amount of such bounty or grant, however the same be paid or bestowed. The Secretary of the Treasury shall from time to time ascertain and determine, or estimate, the net amount of each such bounty or grant, and shall declare the net amount so determined or estimated. The Secretary of the Treasury shall make all regulations he may deem necessary for the identification of such articles and merchandise and for the assessment and collection of such additional duties.

The evidence in the record consists of two stipulations of facts containing, among other things, numerous documents [some of which have been admitted into evidence,[1] but most of which have merely been marked for identification and offered into evidence], and the testimony of five persons presented on behalf of the plaintiff and two persons presented on behalf of the defendant.

■ The basis for assessment of countervailing duties in this case is the remission of certain taxes by the Republic of Italy to the Italian manufacturer of the involved merchandise upon the exportation of said merchandise to the United States. The stipulation (dated Oct. 6, 1969) of the parties breaks down these remitted taxes, termed "Basic Rate Taxes",[2] into the following categories:

Customs Duties and Other Import Charges

---

1. Exhibits 1, 2, 3, 4 and 30 were admitted into evidence at the time of the submission of the case for decision.

2. Certain "specific incidence taxes" also remitted pursuant to Italian Law No. 639 are not involved since they were not countervailed against in T.D. 67–102.

Registration Taxes

Stamp Taxes

Stamp Taxes on Transportation Documents

Other Stamps—Bollo di Surrogazione [Insurance Taxes]

Mortgage Taxes

Advertising and Publicity Taxes

Government Licenses and Authorizations

Taxes for Registration of Motor Vehicles

Other Taxes [surtaxes on above taxes]

It is agreed by the parties, among other things, that the Republic of Italy computed the total Basic Rate Taxes levied against fabricated tower units pursuant to Italian Law No. 639 to be 15.08 lire per kilogram, and the total refund or remission of such taxes upon exportation of such tower units to the United States to be 13.67 lire per kilogram, and also that the Republic of Italy made representations of these facts to the Secretary of the Treasury. No question is raised here by the parties concerning the computation of the amount of the countervailing duties by the Secretary of the Treasury upon the information supplied by the Italian Government. In any case, the accuracy of the amount of countervailing duty is beyond the province of the court to review in a countervailing duty case. Franklin Sugar Refining Co. v. United States, 1 Ct.Cust.Appls. 242, T.D. 31276 (1911).

█ In the aforementioned stipulation of October 6, 1969, plaintiff indicates that it does not press protest objection No. 7 noted above, but that it does not abandon it. However, plaintiff, in not pressing this objection, did not offer any evidence to support it either. Therefore, the court considers objection No. 7 to be unproved.

█ All of the testimonial evidence and some of the documentary exhibits were offered under objection No. 8. Objection No. 8 reads:

The Secretary of the Treasury failed to comply with the requirements of the Administrative Procedure Act (5) U.S.C. § 1001 et seq.) and deprived the importer of due process of law in contravention of the Fifth Amendment to the Constitution of the United States.

This objection does not indicate the nature of the violation or violations alleged to have been committed by the Secretary of the Treasury contrary to the statutes and constitutional provision cited in the protest. This omission is significant because not only is the protest the importer's pleading before this court, it is first and foremost the reference point by means of which the regional commissioner of customs was called upon to review his action in this case.

The mere reference in the protest to the statutes, themselves a substantial body of law, and to the constitutional provision, is too broad and general to furnish a clue to the regional commissioner as to the nature of the alleged errors of commission or omission, not of himself, but of his superior, whose direction the regional commissioner was obliged here to follow in the first instance. And the various pieces of correspondence offered in evidence were exchanged at bureau level or higher, and, therefore, are not indicative of any knowledge on the part of the regional commissioner of the nature of the importer's grievance under protest objection No. 8. Consequently, it serves no useful purpose in this case for the importer to pinpoint the nature of its grievance under protest objection No. 8 for the court's benefit in terms of an evidentiary showing and supporting arguments under Point I of its main brief, since the effect of such endeavors in this case would be to bypass the regional commissioner completely on this particular grievance. Such a blanket form of objection as that characterized by objection No. 8 conferred no jurisdiction upon the regional commissioner to review any particular action of his superior, the Sec-

retary of the Treasury, under the statute and constitutional provision cited, and, by the same token, confers no jurisdiction upon this court to review any action taken by the regional commissioner in this regard, if indeed, he took any action under this particular objection at all. United States v. E. H. Bailey & Co., 32 CCPA 89, 98, C.A.D. 291 (1944).

By reason of the jurisdictional defect affecting protest objection No. 8 no issue relating to the Administrative Procedure Act is properly before us. Consequently, it becomes unnecessary for us to pass upon the admissibility of documentary exhibits offered in evidence by the parties insofar as they relate to protest objection No. 8. Plaintiff's exhibits for identification numbered 14, 17, 20, and 21 and defendant's exhibit for identification lettered A are in this posture, although exhibits 14, 20, and 21 for identification were offered in evidence by plaintiff under other protest objections as well.

■ A number of exhibits offered in evidence by plaintiff have been withdrawn, and as such, their admissibility in evidence is not considered in this case. Plaintiff's exhibits for identification numbered 11, 16, 18, 28, and 29 are in this posture. Plaintiff's exhibits for identification numbered 31 and 32, although marked for identification during the course of testimony given by a witness were never offered in evidence prior to submission of the case (R. 132–142), and, consequently, are not before the court.

■ Exhibits 12, 25, and 26 offered in evidence by plaintiff have not been objected to by the defendant, and as such, are received in evidence without objection. Plaintiff's exhibit 13 for identification is objected to by defendant. This proposed exhibit is merely the covering letter enclosing copies of exhibit 12 which is the complaint filed with the Treasury Department that led to the investigation which culminated in the issuance of T.D. 67–102. Proposed exhibit 13 identifies the United States fabricators of tower units interested in such Treasury Department investigation and countervailing duty action. As such, proposed exhibit 13 constitutes part of the administrative record we review in this case, and, accordingly, is received in evidence as exhibit 13. Defendant's objections will be considered in connection with the weight to be assigned to exhibits 12 and 13.

■ This leaves for consideration the remaining six objections advanced under protest. Objections numbered 1, 2, 3, 5, and 6 are covered under plaintiff's Points II and III of its main brief under which plaintiff contends generally that Italy's refund of the "Basic Rate Taxes" on exports of tower units is not a bounty or grant. Plaintiff argues that refund of internal taxes is not expressly included in section 1303, thereby necessitating resort to administrative interpretation, that the Treasury Department had construed the terms "bounty or grant" as not including refunds of internal taxes, and that the utilization by the Treasury Department in this case of the "directly related" test to justify the imposition of countervailing duties is irrelevant because the Basic Rate Taxes (indirect taxes) are shifted to the consumer on home market sales and their refund on exports gives the manufacturer no advantage.

Remission of taxes as a means of bountification under the tariff laws of the United States has been the subject of *judicial determination*. In Downs v. United States, 4 Cir., 113 F. 144, affirmed in 187 U.S. 496, 23 S.Ct. 222, 47 L.Ed. 275 (1903), the courts sustained the imposition of a countervailing duty by the Secretary of the Treasury under section 5 of the Tariff Act of 1897 on sugar exported from Russia on which excise taxes (imposed on all sugar produced in Russia) had been remitted and a certificate possessing a distinct market value had been issued to the exporter pursuant to Russian laws. The courts found that these practices encouraged the exportation of sugar from Russia and resulted in the payment of bounties. That the courts' decisions in the case applied

equally to the tax remission feature of the case as well as to the marketable certificate issued by the Russian Government is clear from a reading of the opinions in the case. The Fourth Circuit Court of Appeals, adopting the majority opinion [3] of the Board of General Appraisers, quoted therefrom the following language (pp. 151–152):

* * * Our conclusion, therefore, is that a bounty or grant, within the meaning of section 5 of our tariff act, has been paid or bestowed by the Russian government upon the exportation of this sugar, so as to work a benefit or advantage to the Russian sugar exporter, as follows: *First.* Upon the exportation of the sugar, the government remitted or refunded the excise tax due thereon, or otherwise canceled the indebtedness of the sugar manufacturer, so that he was enabled to place his product upon the market free from the burden of either the regular or additional excise tax. *Second.* The certificate which the government issued to him upon the exportation of his sugar had a substantial market value, and was transferable, and operated as a premium, grant, bonus, or reward. Looked at from the Russian standpoint, *these advantages* might, perhaps, be described as a bounty on production; but (in the language of the circuit court of appeals in the Hills Bros. Co. Case, [United States v. Hills Bros. Co., 107 F. 107] supra), 'from the standpoint of other countries,' *they* become a bounty or grant on exportation. * * * (Emphasis added).

And in affirming the decision of the circuit court of appeals, the Supreme Court of the United States said, among other things (p. 513):

* * * But, if a preference be given to merchandise exported over that sold in the home market, by the *remission of an excise tax*, the effect would be the same as if all such merchandise were taxed, and a drawback repaid to the manufacturer upon so much as he exported. If the *additional bounty* paid by Russia upon exported sugar were the result of a high protective tariff upon foreign sugar, and a further enhancement of prices by a limitation of the amount of free sugar put upon the market, we should regard the effect of such regulations as being simply a bounty upon production, although it might incidentally and remotely foster an increased exportation of sugar; but where, *in addition to that*, these regulations *exempt sugar exported from excise taxation altogether*, we think it clearly falls within the definition of an indirect bounty upon exportation. (Emphasis added.)

And further on the subject of tax remission the Supreme Court went on to say in conclusion (p. 515):

* * * When a tax is imposed upon all sugar produced, but is remitted upon all sugar exported, then, by whatever process, or in whatever manner, or under whatever name, it is disguised, it is a bounty upon exportation.

With respect to the certificate issued by the Russian Government in that case, the Supreme Court stated (p. 516):

The object of issuing certificates of sugar exported seems to have been *merely* to enable the exporting manufacturer to obtain the best price for the privilege he assigns to the interior manufacturer of putting an equal amount of free sugar upon the market by assigning the certificates to the one who would offer the best price. (Emphasis added).

It is clear from the language above noted, constituting in our opinion the crux of the holding in the *Downs* case, that the Supreme Court regarded tax remis-

---

3. The dissenting opinion of General Appraiser Tichenor in 4 Treas.Dec. 405, 414–419, T.D. 22984 (1901), devotes a substantial portion of the opinion to arguing against tax remission as a bounty or grant, thus making clear that remission of taxes was a factor in the case from the outset.

sion associated with the exportation of merchandise to constitute an indirect bounty within the meaning of the term "bounty" as used in section 5 of the Tariff Act of 1897. And, as between the bounties involved in *Downs*, the Supreme Court appears to have regarded the tax remission practice as constituting the prime bounty.

The courts have consistently construed the holding in the *Downs* case to constitute a judicial determination that tax remission is a form of a bounty proscribed by section 5 of the 1897 Tariff Act. See F. W. Meyers & Co. v. United States, 6 Treas.Dec. 260, 264–265, T.D. 24306 (1903); Nicholas & Co. v. United States, 249 U.S. 34, 41, 39 S.Ct. 218, 63 L.Ed. 461 (1919). In Nicholas & Co. v. United States, *supra*, a case involving the 1913 Tariff Act countervailing duty statute as applied to an allowance paid upon the exportation of British whiskey and gin, the Supreme Court reaffirmed the *Downs* case holding of tax remission as constituting a bounty in the following terms (p. 41, 39 S.Ct. p. 221):

> Downs v. United States [citation omitted] is a like example, and direct and indirect bounties are illustrated. As an instance of the former the amount paid upon the production of sugar under the Act of Congress of [October 1,] 1890 is adduced, and also the "drawback" (the word of the statute is used) upon certain articles exported; as instances of the latter, that is, of indirect bounties, the remission of taxes upon the exportation of articles which are subject to a tax when sold or consumed in the country of their production is given, * * *.

Section 5 of the Tariff Act of 1897 which was construed in *Downs* appears to have been the progenitor of broad based countervailing duty statutes enacted by Congress down through the years, including section 1303. But even in the predecessor Tariff Act of 1894 Congress appears to have recognized that tax remission upon exported products (sugars) was a form of indirect bounty, although at this point Congress decided that it could live with it. Thus, in enacting paragraph 182½ of the 1894 Tariff Act (28 Stat. 521) under the sugar schedule (Schedule E) Congress, after providing for the payment of regular duties on imported sugars and also for additional duties upon bounty-fed importations, added the following proviso to the paragraph:

> *Provided,* That the importer of sugar produced in a foreign country, the Government of which grants such direct or indirect bounties, may be relieved from this additional duty under such regulations as the Secretary of the Treasury may prescribe, in case said importer produces a certificate of said Government that *no indirect bounty* has been received upon said sugar *in excess of the tax collected* upon the beet or cane from which it was produced, and that no direct bounty has been or shall be paid: * * *. [Emphasis added except for the word "Provided".]

However, this proviso was not carried forward into the sugar schedule of the 1897 Tariff Act (Schedule E—par. 209) or written into the broad based countervailing duty provisions of section 5 of that Act. Consequently, with the advent of the decision of the Supreme Court in *Downs*, it is clear that if Congress had wanted to nullify the effect of the decision in that case it could easily have done so through reenactment of a successor provision to section 5 of the 1897 Tariff Act (or amended the statute) that expressly excluded tax remissions from its ambit, akin to its treatment of that subject in paragraph 182½ of the 1894 Tariff Act. The fact that Congress has never done so is, in our opinion, indicative that it approves of the holding in *Downs*, by reason of which, that case represents the law on the subject of tax remissions to date insofar as the question of "bounties" is concerned.

■ The courts are mindful of the fact that the Secretary of the Treasury has not always countervailed (for whatever reason) in a case which seems to the courts to require such action *vis-a-vis*

the countervailing duty statutes in our tariff laws. See United States v. L. Bamberger & Co., 59 Treas.Dec. 905, T. D. 44818 (1931), and Hammond Lead Products, Inc. v. United States (Ralph Valls, Party-in-Interest), 63 Cust.Ct. 316, 322–323, C.D. 3915, 306 F.Supp. 460 (1969), reversed sub nom. United States (Ralph Valls, Party-in-Interest) v. Hammond Lead Products, Inc., 58 CCPA 129, C.A.D. 1017, 440 F.2d 1024 (1971), decided April 22, 1971. While it appears from these cases that the courts are unable to control the incidence of the imposition of countervailing duties by the Secretary of the Treasury, it is beyond question that the courts have the authority and responsibility to review the determination of the Secretary of the Treasury imposing a countervailing duty pursuant to our tariff laws, and in such cases to interpret the meaning of the statutory terms "bounty or grant" as applied to the facts. Downs v. United States, *supra*; Nicholas & Co. v. United States, *supra*; F. W. Woolworth Co. v. United States, 115 F.2d 348, 28 CCPA 239, C.A.D. 151 (1940); Energetic Worsted Corp. v. United States, 53 CCPA 36, C.A.D. 874 (1966). In view of the holding in Downs v. United States, *supra*, adjudicating tax remission upon exported merchandise to constitute an indirect bounty, we deem it unnecessary in this case for us to explore the implications of the practices of the Secretary of the Treasury with regard to internal taxes or the nature of such taxes (i. e., direct and indirect) discussed at length in the briefs of counsel.

Our attention has been directed to administrative consideration of the question largely if not solely as the result of counsels' belief that language in *Downs* on the subject of tax remission is dicta— a position contrary to our interpretation. *Downs* is controlling on the facts of this case. And since *Downs* applies the ordinary meaning of the term "bounty", it is immaterial whether or not the taxes remitted are denominated direct taxes or indirect taxes. In either event the

remitted taxes would come within the ordinary meaning of the term "bounty".

In the instant case the remitted, abated, or refunded taxes admittedly have their genesis in Italian Law No. 639 of July 5, 1964. This law provides for the refund of certain fiscal charges other than the general transaction tax (IGE) for products of the metal mechanical industry which are exported, including units for electrical transmission towers. These fiscal charges, remitted, abated, or refunded according to an average computed by the Italian Government, have been enumerated hereinbefore. The Secretary of the Treasury in T.D. 67–102 found that the rebate of these taxes constituted a bounty or grant, albeit for the reason that Italian Law 639 rebated fiscal charges not related directly to the exported product or to the raw components therein. Since the Italian law authorizes and pays a bounty upon the subject merchandise within the meaning of section 1303, we are compelled to sustain this administrative action upon the authority of the holding of the Supreme Court in Downs v. United States, *supra*. Therefore, we hold as a matter of law that the taxes remitted, abated, and refunded in this case pursuant to Italian Law No. 639 constitute bounties within the meaning of section 1303.

Article VI(4) of the GATT to which reference is made in the briefs of counsel doesn't require a different disposition of this issue even if given the interpretation which plaintiff seeks to put upon it. Plaintiff contends that basic rate taxes come within the language of Article VI(4) of the GATT. Assuming plaintiff's interpretation of the GATT to be correct it would conflict with an act of Congress, 19 U.S.C.A. § 1303. The supreme law of the land consists of the Constitution, and the laws of the United States made in pursuance thereof, and all treaties made under the authority of the United States. Constitution of the United States Article VI. GATT is a trade agreement, which if in conflict

with a law of Congress, must yield to the latter.

In view of this holding we are of the opinion that documentary evidence bearing upon the administrative interpretation of tax remission, abatement, or refund on exported merchandise in relation to the statutory term "bounty" is irrelevant in this case. Plaintiff's exhibits for identification numbered 5, 6, 7, 8, 9, 10, 14, 15, 19, 20, 21, 22, 23, and 24 are in this posture, and as such, an objection to their admission into evidence is sustained.

We turn now to the final contention advanced by plaintiff under protest objection No. 4 which is covered in Point IV of its main brief. Plaintiff contends here that T.D. 67–102 is, in addition to a violation of GATT, a violation of a treaty between Italy and the United States, and the fifth and fourteenth amendments to the United States Constitution, by reason of the Secretary of the Treasury having discriminated against Italy in the imposition of countervailing duties thereunder. It is questionable, in the form in which this grievance is stated in protest objection No. 4, that plaintiff would have any standing to litigate the question raised here on behalf of the Italian Government, or on behalf of importers of products from Italy as a class. We, therefore, consider protest objection No. 4 only to the extent that it may be read to urge relief on behalf of the plaintiff *pro se.* And even as so limited by us we do not see in this case any occasion to measure plaintiff's rights by the provisions of section 1 or any other section of the fourteenth amendment or any provision of the fifth amendment to the federal constitution. Section 1 of the fourteenth amendment is a guarantee against invasion or abridgment of a citizen's rights by state action—a factor clearly not present in this case. See Simpson v. United States, 1965, 7 Cir., 342 F.2d 643; United States v. Cook, D.C.Pa.1970, 311 F.Supp. 618.

The basis for plaintiff's charge of discrimination by the Secretary of the Treasury against Italian products in favor of products of other countries is founded in a colloquy recorded in a transcript of a meeting between Treasury Department personnel and representatives of the Italian Government held on March 16, 1967, at the Treasury Department in Washington, D. C., comprising a portion of plaintiff's exhibit 14 for identification, and also in the testimony given at the trial by Fred B. Smith, former general counsel to the Treasury Department. Additionally, plaintiff offered in evidence as exhibit 27 for identification a portion of a report of the Organization for Economic Co-Operation and Development dated October 12, 1964, with a view toward establishing that the Treasury Department had knowledge that other countries rebated taxes similar to the taxes rebated by Italy in this case. Plaintiff also offered in evidence as exhibit 15 for identification a speech given by Assistant Secretary of the Treasury, Stanley S. Surrey, before the National Industrial Conference Board in New York City on February 15, 1968, on the subject Implications of Tax Harmonization in the European Common Market, with a view toward establishing knowledge on the part of the Treasury Department of the rebate of hidden taxes by common market countries. And our attention is also called by plaintiff to census bureau reports showing importations of the subject items of merchandise from other common market countries, among others, during the period involved in this case.

Defendant objects to the admission into evidence of plaintiff's proposed exhibits 14, 15, and 27. Defendant's objection as to exhibit 14 for indentification is on the ground that no foundation has been laid for receiving the notes in evidence as past recollection recorded, and also on the ground that the proffered evidence violates the best evidence rule. Mr. Garfield, the plaintiff's attorney and the author of the notes contained in plaintiff's exhibit 14 for identification, testified at the trial (R. 71–72):

I recollect in a general way what was said, and I recollect, but I do not

recollect it in the sequence in which it was said, nor do I recollect it in the specific manner or words in which it was said * * * I would prefer to really rely upon Exhibit 14 for identification, * * *.

The witness testified that he remembered most of the persons at the meeting he attended, and also possessed an independent and general recollection of the meeting itself. And it was established that the witness subsequently added personal comments to the notes he had taken at the meeting, and then later deleted the addenda. Also, the witness was unable to account for the absence of the original handwritten notes and the transcript dictated from his original notes which he thought he still had in his possession.

In this connection, Fred B. Smith testified that he attended this meeting, and that he did not recall having made one of the statements attributed to him in the notes in question. In view of this record it has not been shown that the witness' recollection of the meeting has been exhausted, or that the memorandum was prepared at the time of the meeting, or that the original notes and initial transcript thereof were not available for use as evidence. Consequently, defendant's objections are well taken, and plaintiff's exhibit 14 is also excluded for these additional reasons.

■■■ Defendant's objections to exhibit 15 for identification are on the grounds that the speech is hearsay, and is irrelevant in point of time and substance. The record shows that the proffered exhibit is a speech relating to border tax adjustments and European tax systems in general given well after the issuance of T.D. 67–102, to wit, on February 15, 1968. Therefore, the proposed exhibit is irrelevant to the period circumscribed by the protest, i. e., the period culminating in the issuance of T.D. 67–102, dated April 21, 1967. Defendant's objection is also sustained on the ground of irrelevancy.

■■■ Defendant's objections to exhibit 27 for identification are on the grounds that the report is hearsay and is irrelevant. The report is dated October 12, 1964. As such, the report is too remote from the period of investigation underlying the subject countervailing duty order to possess probative value on the question of the Secretary's knowledge during the critical time. See Energetic Worsted Corp. v. United States, supra, 53 CCPA at pp. 42–43. Consequently, defendant's objection is sustained on the ground of irrelevancy. The court may, of course, take notice of the census reports to which our attention has been called. But while these reports may indicate in general terms the importation of merchandise from other common market countries classifiable in the same categories as the merchandise at bar, in view of the foregoing evidentiary rulings there is no competent, factual evidence of record of contemporaneous knowledge[4] on the part of the Treasury Department that tax remissions affected these importations.

It follows from the foregoing that the protest herein must be overruled.

Judgment will be entered accordingly.

LANDIS, J., concurs.

---

4. Since the Secretary of the Treasury was in possession of the "complaint" that set into motion the investigation underlying T.D. 67–102, received in evidence herein as plaintiff's exhibit 12, he obviously was aware of exhibit E annexed to said complaint [Commerce Clearing House translation] which points out that after enactment of Italian Law No. 639 Italy's common market partners successfully challenged its tax remission practices under this law in the Court of Justice, culminating in a judgment by that court in 1965 which determined that Italy's tax remission practices violated its own commitment to its E.E.C. partners. Plaintiff does not discuss this aspect of the case at all, not even in its reply brief, although defendant comments on the subject at pages 88–89 of its brief. In view of such evidence, it would seem that nothing but the most cogent evidence of awareness on the part of the Secretary of the Treasury of like practices by Italy's common market partners during the 1967 countervailing duty investigation of Italy's tax remission practices could support an accusatory charge of discrimination by the Secretary of the Treasury.